Caldwell, Ch. J.
This is a controversy between the creditors of Charles O'Harra, an insolvent debtor, about the distribution of his property. O’Harra was a dry goods merchant, of the city of Toledo, and had been doing business there for about two years prior to 1846. The business was done exclusively in the name of O’Harra; but the firm of Tompkins & Benedict, of New York city, claim that they were dormant partners, and owned a large interest in the Btock of goods. In the latter part of the year 1845, the partnership between O’Harra and Tompkins & Benedict was dissolved. O’Harra continued the business on his own account, and retained the stock in trade of the firm, and thereby became indebted to Tompkins & Benedict for the amount of their interest in the concern. It does not appear that the terms of payment of this indebtedness of O’Harra were fixed, or any evidence of it given at the time of the dissolution of partnership ; it is said by Tompkins, in his answer, that these matters were to be adjusted in the spring, when O’Harra was expected to visit New York. About the first of June, 1849, O’Harra visited Now York, and with Tompkins executed an article of agreement, which, after reciting that O’Harra had purchased all the interest of the late firm of Tompkins & Benedict in the business of O’Harra, for the sum of $33,000, and that O’Harra had given a bond and power of attorney to confess a judgment for that amount, in ten days, and had also given his notes for the same sum, payable at different dates, during the years 1846, 1847, and 1848, provided that Tompkins was not bound to wait until the notes should become due, but might, at any time, if he should think the amount thus owing to him in jeopardy, without waiting the maturity of the notes, proceed to collect the same by any legal *means. It also authorized him, in such case, to take possession of the goods, debts, dues, demands, and effects of every *41 kind of O’Harra’s, and apply them, or so much of them as might be necessary, to the payment of the debt.
O’Han’a also in the agreement further covenanted and pledged his honor that, in ease of embarrassment so that he could not continue his business, he would at once assign all his property and effects to Tompkins, preferring him before all other creditors. This agreement, with the notes, bond, and warrant of attorney, all bear date on the first of June, 1846. Tompkins in his answer says that although these papers bear date on the first of June, yet that they were not, in fact, executed until the 8th of June. There is, however, no evidence, of that fact.
O’Harra, .at this time, from the 3rd to the 5th of June, inclusive, purchased about $20,000 worth of goods, on credit, from divers merchants of New York, among whom are the complainants in this case. O’Harra referred those from whom he made his purchases to Tompkins. Tompkins represented to several, if not all of them,’ that O’Harra was a good man, and worthy to be trusted, doing a prosperous business, and that he himself would trust him, etc.
These creditors allege that they trusted O’Harra on the representations of Tompkins. About the first of December, 1846, Tompkins sent these papers, which he held against O’Harra, to H. V. Wilson, an attorney of Cleveland, with instructions to secure the claim in such a way as to him might appear best. Wilson entered up judgment by virtue of the warrant of attorney in Summit county, for upwards of $34,000, the amount of the claim—took out an execution on his judgment, and went to Toledo, carrying with him the execution. Wilson arrived in Toledo on the 6th of December. He did not have a levy made under the execution, nor did it appear that he informed O’Harra that he had such execution. At this time the notes which O’Harra had given to the New York merchants for the goods purchased in June were falling due and O’Harra was unable to meet them : indeed, there can be no doubt from *tbe evidence in the case, that O’Harra was largely insolvent. On the 11th of December, O’Harra made to Wilson a conveyance, in writing, of all his notes and accounts, amounting in the aggregate to between twelve and fifteen thousand dollars. This conveyance is absolute on its face; but Wilson says, in his deposition, that it was intended as collateral security for the debt. Wilson left Toledo in a few days, leaving the papers and business with E. D. Potter, an attorney of Toledo. Before leaving, however, *42 Wilson had made an agreement with Beck, the clerk of O’Harra, that if O’Harra was about to dispose of the goods, he, Beck, should inform Wilson or Potter of it; and that the proceeds of the sale should be placed in the bank to the credit of Wilson. It appears that the execution which Wilson took with him to Toledo, contained, or was supposed to contain, some clerical error, and he returned itto Summit county, to have it reissued. After the correction was made, he returned it to Potter, who received it about the 20lh of December, with instructions from Wilson to have it levied. On the 9th of January, 1847, the goods were attached by William Mercer, as the property of Tompkins & Benedict, on a claim which he had against them, and which appears, although the evidence is not positive on that subject, to have been founded in one of the notes given by O’Harra to Tompkins in June, and assigned by him to Mercer, and which formed a part of the amount for which the judgment had been taken in Summit county, Potter paid off the claim of Mercer, out of the notes that had been assigned by O’Harra to Tompkins, and immediately levied the execution, which he held in favor of Tompkins, on the goods in the store of O’Harra, and proceeded to make sale of them. On the 29fch of January, the complainants, Doremus & Nixon, and Stebens & Co., on behalf of themselves, and other creditors of O’Harra, filed this bill, claiming a general distribution of the effects of O’Harra among his creditors; a receiver was appointed, who has taken charge of' the property of O’Harra, and also the proceeds of the sale by the sheriff. The pleadings, evidence, and ^arguments of counsel are so voluminous, and the points raised so numerous, that it will be out of our power to refer in detail to the matters in controversy; but we are obliged to refer in a general manner to such questions and facts as we suppose must be decisive of the different points in the case.
In the first place it is contended, on the part of the complainants, that the assignments of the notes and claims of O’Harra, made on the 11th of December, 1846, to Tompkins, come within the provisions of the statute of 1838, relating to assignments to trustees for the purpose of preferring creditors ; and that the property embraced in this assignment should inure to the benefit of all the creditors. On the other hand, it is contended, on the part of Tompkins, that the assignment to him was made to secure his own debt, and that he could not in any way be held to be a trustee, holding the property for the benefit of the other creditors. We have been *43 referred to the decision of Mitchell v. Gazzam, 12 Ohio, 315, as giving the true rule applicable to this case. In reference to that decision, we would merely remai'k, that wo think the opinion expressed by the court gives a more extensive operation to the statute than its provisions would warrant.
It would probably be the most equitable mode of distributing the effects of an insolvent debtor to divide the proceeds equally among his creditors, and, when the fact of his insolvency became certain, to prevent one creditor from in any way getting the advantage of another. But this has never been the general policy of our law.
The principle of permitting a creditor to reap the advantage of his vigilance in securing his claim against a failing debtor, is the one that has obtained, with but few exceptions, in our legislation. Hence the party who obtains the first judgment gets a lien on the real estate to the exclusion of other creditors, and he who levies the first execution on personal property appropriates the whole to the payment of his claim, although the debtor, in either instance, may be notoriously insolvent.
The same rule has been adopted in chancery proceedings. *Thus, where a party files his bill to subject equitable assets to the payment of his debt, he thereby obtains a preference over other creditors, although such other creditors maybe parties to the same suit. In this view of the case, we do not feel authorized to give any strained construction to the statute, although such construction might tend to promote equality among creditors. Indeed, we do not see any difference in principle, between a creditor securing himself, by taking a lien on the property of a failing debtor, if fairly and honestly done, and thereby obtaining a preference over other creditors, and his obtaining a similar preference by procuring a power of attorney to confess a judgment, or by making the first levy. The language of the statute is plain and explicit: “ All assignments of property in trust, which shall be made by debtors to trustees in contemplation of insolvency, with the design to prefer one or more creditors, to the exclusion of others, shall be held to inure to the benefit of all the creditors,” etc. Swan’s Stat. 717. If the intention of the legislature had been, that all assignments of property made by debtors in failing circumstances should inure to the benefit of all the creditors, they would certainly have stated this simple proposition in more plain and perspicuous terms. We suppose that the plain and obvious intent of the law was only *44 to apply to those cases where the person receiving the assignment could be considered as standing in some relation as a trustee, either in terms or by fair implication, other than that which the mere taking of security for his debt would create. Now what was the character of this assignment to Tompkins? The judgment was in the name of Tompkins, and the debt had been originally his. The notes that O’Harra had given evidencing this debt had been assigned by Tompkins to different persons. The judgment had been taken on the bond and power of attorney without any reference to notes. It would appear, from the direct evidence in the case, that such an assignment had been made on the part of the notes. The claim of Mercer, in virtue of which the attachment was levied, appears to have been founded on one of these notes; *but the state of the pleading has removed all doubt on this subject. The amended bill alleges that most, if not all, of these notes wore transferred by Tompkins to his creditors, and charges that the note held by Mercer was one of them. This bill has never been answered by defendants, and we are bound to take its material averments as confessed. In taking this assignment, then, Tompkins received it as a trustee for the benefit of those who were thus entitled to their respective shares of the debt. The assignment, by its terms, as well as its intention, preferred creditors, and there is no question but that it was made with a full knowledge that O’Harra was insolvent. This assignment then comes clearly within the statute, and the property thus assigned must be decreed to inure to the benefit of all the creditors in proportion to their respective demands. The nest question arises in reference to the stock of goods. It is urged, on the part of complainants, that Wilson took possession of the store of goods at the time that he visited Toledo, in accordance with the contract of the first of June, 184G, and that the goods were actually in the possession of Tompkins, by his agents, from that time up to the time of the levy; that Tompkins therefore held the goods in trust for the benefit of all the creditors. The contract of June did not give a lien on the property; it only provided that Tompkins might, if he considered his claim in jeopardy, take possession of all the goods and dispose of them for his own benefit. It further provided, that if O’Harra should fail to meet his engagements, that he would make an assignment to Tompkins of all his effects, preferring him to all other creditors. Now, if Tompkins, previous to the levy, had taken possession of *45 these goods by virtue of his agreement, or by any other assignment, ho would, under the circumstances, have become a trustee for the benefit of all the creditors, and could not have destroyed or affected the trust by his levy. Did Wilson or Potter, or any other person, on behalf of Tompkins, receive an assignment of, or take possession of these goods? The evidence relied on by complainants consists principally of the ^statements of O’Harra, and the statements and conduct of Potter and Wilson in reference to the goods. D. O. Morton states that at the time Wilson was in Toledo, Wilson stated to him that O’Harra had turned out everything to him, and that he supposed he meant the goods as well as the other assets. O’Harra stated to a number of persons that he had delivered up his store and everything to Tompkins. Potter, after Wilson left, called on two or three persons and tried to make a sale of the goods, stating that he would have the fixing of the terms of payment, as the money was coming to him. Wilson agreed with Beck, the clerk of O’Harra, that in case O’Harra should attempt to dispose of the goods, that he, Beck, should immediately inform Potter of that fact. He also agreed with him, that the proceeds for sale in the store should be deposited in the bank, to the credit of Wilson, and at the same time made an arrangement with the cashier to send him the money. It appears, too, that about the month of December, 1846, Tompkins wrote a letter to Culbertson, of Pickaway, offering to sell him this stock of goods. This, and some other evidence of a similar character, is relied on as showing the goods to have been in the possession and under the control of Tompkin’s agent. The evidence, unexplained, would go very far to prove this state of ease. On the other hand, we have the positive statements of both Wilson and Potter, that they never took any assignment of the goods, nor took possession of them in any way. Wilson says he had no conversation with O’Harra in reference to an assignment of the goods; that he had with him the agreement of the first of June, but he did not show it to O’Harra, nor did he intend to use it, unless it became absolutely necessary.
Potter states that he and Wilson had consultation on the subject of an assignment, and agreed that it would not do, and that they would rely on their execution. It would appear probable, from the evidence, that O’Harra thought that Tompkins had control of the goods, by virtue of the contract of June; and that the agents of Tompkins did not take %ny pains to disabuse his mind on *46 that subject. As Potter expressed it to some one, he was willing to indulge him in that conceit. Potter states that he and O’Harra had agreed, that if the goods could be sold at private sale, that the proceeds should be applied to the payment of Tompkins’ debt; and that, to avoid the sacrifice that would be likely to attend a sale on execution, he interested himself in having them thus disposed of. Now, there is no doubt but that Wilson and Potter, being in advance of the other creditors, and holding in their hands an execution which they could at once lay on the goods, felt towards them as if they belonged to Tompkins, and this, we believe, goes to explain most of their statements and acts, which, unexplained, might bear another construction.
Now, the fact that Wilson made an arrangement with the clerk of O’Harra, to receive for his use all the proceeds of the sale, does not necessarily imply that he considered the goods as under his Control, because he might receive the proceeds of sale to apply on Tompkins’ claim, and the goods still remain in O’Harra. Still, it is a strong item of evidence, unexplained, to prove the goods in the control of Tompkins. If we are right, however, in our opinion that O’Harra thought that Tompkins had an absolute right to the control of the goods by virtue of the agreement of June, it will go far to explain why he, O’Harra, was willing to acquiesce in such an arrangement'. A careful examination of the evidence has brought tis to the conclusion that Wilson and Potter never received an assignment of the goods, nor over took them into possession, and Tompkins consequently had a right to hold' the goods, freed from the claims of the other creditors by virtue of his levy.
It is urged on the part of complainants that Tompkins was guilty of a fraud, in representing to them, at the time they sold him the goods, that he, O’Harra, was a safe man to be trusted. Now, we can hardly think it probable that Tompkins could have thought OHarra’s circumstances such as he represented them to be. We do not see, however, that *any claim that complainants may háve against Tompkins on this account can be adjusted in this case. This is a proceeding by the creditors of OHarra, to subject his effects to the payment of their claims. Any claim that one creditor may have against another is collateral to the object of the case. Besides, the nature of the claim does not fall within the general jurisdiction of a court of chancery. This disposes of *47 the whole case; and we do not consider it necessary to proceed further to notice the other points that have been discussed.

Decree for Complainants.